[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11858

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MICHAEL PEYTON GUNN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 1:20-cr-00014-JRH-BKE-1

_____

Before JORDAN, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

A jury convicted appellant Michael Peyton Gunn of conspiring to sex traffic a child, coercing and enticing a child to engage in sexual activity, producing child pornography as a parent, possessing child pornography, and obstructing a child sex-trafficking investigation. On the morning when Gunn's trial was set to begin, he requested a continuance. He argued that the government had failed to turn over several videos of Gunn's wife (an alleged co-conspirator), which Gunn said contained exculpatory evidence, in violation of the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963). He requested a continuance so that he could obtain copies of the videos. The district court denied Gunn's motion for a continuance and concluded that there was no *Brady* violation. Gunn challenges the district court's decision on appeal. After careful consideration, we affirm.

**I.**

In January 2020, FBI agents discovered that pornographic images of Gunn's minor child were circulating on the internet. FBI agents Harold Godbee and Jonathan Escobar visited Gunn's home and met with Gunn and his wife, Amanda Gunn,[1] to make

---

[1] In this opinion, we refer to Michael Gunn as "Gunn" and Amanda Gunn as "Amanda."

them aware of the sexually explicit images and to check that the child was safe. At one point during the conversation, Gunn stated that there was a "video of his wife on the internet having sex with multiple men." Doc. 324 at 99.[2] This comment struck the agents as odd because they did not understand why Gunn was discussing Amanda when they were there to talk about pornographic images of the child.

The day after visiting Gunn's home, Godbee learned that additional pornographic images of the child had been found. In one of the photographs, Godbee could see a man's sneaker, which suggested "there was someone in the room . . . when the [child] was either taking these pictures or having these pictures taken." *Id.* at 414. Godbee and other agents returned to Gunn's home, which Gunn agreed to allow them to search. During the search, the agents found sneakers that matched the shoe in the photograph. The child confirmed to the agents that the shoe in the photograph belonged to Gunn and that he had taken the photograph. Gunn was arrested.

As the agents continued their investigation, they uncovered more pornographic images of the child that Gunn had created, including images depicting the child being tortured. The agents also uncovered that Gunn had engaged in other criminal conduct. The child disclosed in interviews with the agents that

---

[2] "Doc." numbers refer to the district court's docket entries.

Gunn had repeatedly raped her and that he had been selling her to other men for sex. Through subpoenas and search warrants, the government obtained internet communications that corroborated the child's report.

A grand jury returned an indictment charging Gunn with one count of conspiracy to commit sex trafficking of a child, in violation of 18 U.S.C. § 1594(c); one count of sex trafficking of a child, in violation of 18 U.S.C. § 1591(a) and (b)(1); one count of coercion and enticement of a child to engage in sexual activity, in violation of 18 U.S.C. § 2422(b); four counts of production of child pornography by a parent or guardian, in violation of 18 U.S.C. § 2251(b); one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and one count of obstructing a child sex-trafficking investigation, in violation of 18 U.S.C. § 1591(d). The indictment also charged Amanda with one count of conspiracy to commit sex trafficking of a child and one count of obstructing a child sex-trafficking investigation.

Both Gunn and Amanda initially pled not guilty to the charges. Approximately two weeks before the trial was set to begin, Amanda pled guilty to the conspiracy count. Under the terms of the plea agreement, the government agreed to dismiss the obstruction charge and recommend that she receive a sentence of 15 years, which was the mandatory minimum that she faced for the conspiracy offense.

On the morning when Gunn's trial was supposed to begin, Gunn, through his counsel, raised with the district court that the

government had failed to turn over exculpatory evidence as required under the Supreme Court's decision in *Brady*. Gunn explained that shortly after his arrest, as part of the government's investigation, Godbee had reviewed a series of videos uploaded to the website PornHub that depicted Amanda engaging in sexually explicit conduct. Gunn stated that the government had not turned over copies of the videos and thus violated *Brady*.

According to Gunn, the videos qualified as exculpatory evidence because they showed Amanda reading from a script that was similar to one the child had used in an explicit video and thus supported Gunn's theory that it was Amanda, not Gunn, who had forced the child to engage in the illegal conduct. Gunn also argued that the videos would be impeachment evidence because they would refute any testimony from Amanda that Gunn coerced her to engage in sexual activity. Although Gunn asserted that the government should have turned over the videos, he acknowledged that the violation was not "intentional" and that the government had not acted in "bad faith." Doc. 324 at 5.

Given the government's failure to turn over the evidence, Gunn asked that the court grant a continuance and delay the trial. He explained that PornHub had removed the videos from its website due to the government's investigation. Noting that the government had recently served a search warrant on PornHub requesting the videos, he sought additional time to see if the company would produce copies of the videos.

The government opposed Gunn's request for a continuance. It acknowledged that Godbee had reviewed at least one of the videos as part of the investigation. But it explained that Godbee had not recorded or taken screenshots of the video. Because the "videos have never been in . . . possession of the government," it argued that no *Brady* violation had occurred. *Id.* at 7.[3] The government confirmed that it had recently served a search warrant on PornHub to obtain copies of the videos. But it explained that its efforts to secure copies of the videos from PornHub through the search warrant had been unsuccessful. The government also pointed out that Gunn had known about the videos since at least February 2020 because he mentioned them during his initial meeting with the agents.

The district court denied Gunn's request for a continuance. The court concluded that because the government never had possession, custody, or control of the videos, there was no *Brady* violation.

The case proceeded to a trial, which lasted four days. The government's trial witnesses included Godbee and other FBI agents involved in the investigation as well as the child and Amanda.

---

[3] The government also took the position that the videos were not exculpatory and would not impeach Amanda's testimony.

Godbee, Escobar, and the other FBI agents provided detailed testimony about their investigation, including the initial meeting with Gunn and Amanda. The jury also heard how the agents found pornographic images of the child, including images of the child being tortured, and traced these images to Gunn. In addition, the agents testified about uncovering evidence that Gunn had raped the child and forced her to have sex with men for money.

On cross examination, Gunn asked Godbee about the sexually explicit videos of Amanda that had been posted to PornHub. Godbee admitted that during the investigation he found videos on PornHub of Amanda engaging in sexual conduct and reviewed them but did not record them or save them. Godbee explained that he did not record the videos because he came across them "very early on" in the investigation and it was not illegal for an adult to post pornographic videos on the website. *Id.* at 534. Godbee conceded that based on the content of the videos, and assuming that Amanda had "willingly" participated in the conduct depicted, he would have concluded that she had engaged in "deviant sexual behavior," including sadomasochism. *Id.* at 535.

The child also provided detailed testimony about Gunn's crimes. She described how over a several-year period Gunn repeatedly raped her. She also described how, beginning when she was about 11 or 12 years old, Gunn forced her to pose for pornographic pictures and to have sex with men for money. The child

also testified that after Godbee visited the home, Gunn removed items from the family's home and destroyed her cell phone.

In addition, the government called Amanda as a witness at trial. Amanda admitted that she had conspired with Gunn to sex traffic their child.[4] In her testimony, Amanda described how she, too, was a victim of Gunn's abuse. Amanda testified that Gunn had convinced her that the MS-13 gang would kill their family unless she posed for pornographic pictures and videos and engaged in prostitution. Although the pornographic images of Amanda were initially published on the internet under an alias, Gunn later changed the alias to include Amanda's first name "[a]s a punishment for . . . not being a good enough whore." *Id.* at 291.

Amanda testified about other punishments that Gunn inflicted upon her. On one occasion, Gunn told Amanda that the gang was unhappy because she was not flirting with enough men on the internet and that she would be raped as punishment. After making Amanda drink alcohol and take pills, Gunn blindfolded her, and a group of men came to the home and raped her. Gunn recorded the rapes and posted the video on PornHub.

Amanda further described how Gunn destroyed evidence after the agents came to the house and reported finding pornographic images of the child on the internet. According to Amanda,

---

[4] At the time of trial, Amanda had pled guilty to the conspiracy charge but had not yet been sentenced. The district court later sentenced her to 235 months' imprisonment.

after the agents left, Gunn removed items from their house, including a laptop. She saw Gunn drill a hole into a flash drive so that the data stored on the drive could not be accessed. Gunn told Amanda that he was going to destroy the child's cell phone and hide the pieces.

On cross examination, Gunn's attorney suggested that it was Amanda alone who had produced the child pornography and sex trafficked the child and that she made up the story of Gunn's involvement to avoid being held responsible for her crimes. The attorney accused Amanda of posting sexually explicit videos of herself on PornHub and having a "deviant sexual lifestyle." *Id.* at 340. Amanda denied these accusations.

At the close of evidence, Gunn moved for an acquittal on all counts, challenging the sufficiency of the evidence. *See* Fed. R. Crim. P. 29. The district court denied the motion. The jury convicted Gunn on all counts.

After the trial, Gunn filed a motion for judgment of acquittal or, in the alternative, a new trial, again challenging the sufficiency of the evidence. The court denied the motion and later imposed a life sentence. This is Gunn's appeal.

## II.

"The Sixth and Fourteenth Amendment to the U.S. Constitution guarantee that any person brought to trial in any state or federal court must be afforded the right to assistance of counsel before he or she can be validly convicted and punished by imprisonment." *United States v. Verderame*, 51 F.3d 249, 251 (11th Cir.

1995). "Implicit in this right to counsel is the notion of adequate time for counsel to prepare the defense . . . ." *Id.* at 252. As a result, "[u]nder certain circumstances, denial of a motion for continuance of trial" may violate the Constitution. *Id.* at 251. To prevail on a claim that the denial of a continuance amounted to a constitutional violation, a defendant "must show that the denial of the motion for continuance was an abuse of discretion[,] which resulted in specific substantial prejudice." *Id.*

Gunn argues that the district court abused its discretion in denying his motion for a continuance because it deprived him of an opportunity to prepare his defense by obtaining copies of the videos of Amanda that were posted on PornHub. According to Gunn, the videos constituted favorable evidence that the government was required to disclose under *Brady* because the videos showed that Amanda had a "deviant sexual lifestyle" and thus was "more likely the person to have committed the acts of exploitation against the" child. Appellant's Br. at 7.

In *Brady*, the Supreme Court recognized that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a *Brady* violation, a defendant must show: (1) the government possessed evidence that was favorable to him; (2) he did not possess the evidence, nor could he have obtained it with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and

(4) if the evidence had been disclosed, there is a reasonable probability that the outcome of the trial would have been different. *United States v. Stahlman*, 934 F.3d 1199, 1229 (11th Cir. 2019).

Even assuming that the PornHub videos were evidence favorable to Gunn, we agree with the district court that no *Brady* violation occurred.[5] Gunn failed to show that the government possessed the videos. Certainly, the record reflects that Godbee viewed the videos of Amanda that were posted on PornHub as part of his investigation. But there was no evidence that Godbee downloaded the videos or made screen recordings to preserve them. It is also true that shortly before trial the government attempted to obtain copies of the videos by serving a search warrant on PornHub. But the government's attempt was unsuccessful. Because the government did not have the videos in its possession, we conclude that no *Brady* violation occurred.

Gunn's *Brady* claim also fails for another reason: he failed to show that he could not obtain the videos with reasonable diligence. The record reflects that Gunn knew of the videos by Feb-

---

[5] Gunn argues that we review *de novo* the district court's determination that no *Brady* violation occurred. *See United States v. Brester*, 786 F.3d 1335, 1338 (11th Cir. 2015). By contrast, the government says that we review this issue for plain error only because Gunn did not raise his *Brady* claim in his motion for new trial. *See United States v. Gallardo*, 977 F.3d 1126, 1142 (11th Cir. 2020). We need not resolve this dispute because, even assuming *de novo* review applies, we cannot say that the district court erred in concluding there was no *Brady* violation.

ruary 2020, when he mentioned them to the agents during their initial meeting. And at that point in time the videos were still available on PornHub. If Gunn had acted with reasonable diligence, he could have obtained copies of the videos by downloading them from PornHub.

Before concluding, we note that a constitutional violation also may occur when the government loses or destroys evidence. *See United States v. Revolorio-Ramo*, 468 F.3d 771, 774 (11th Cir. 2006). To establish a due process violation based on the loss or destruction of evidence, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed[] and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (internal quotation marks omitted). In addition, when the lost evidence was not clearly exculpatory but only "potentially useful," the defendant must show that law enforcement acted in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988).

Here, Gunn has raised no argument on appeal that a due process violation occurred based on the government's failure to preserve the videos when Godbee first viewed them. Thus, he has forfeited the issue of whether a due process violation occurred based on the government's loss or destruction of evidence. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc). But even assuming Gunn had raised this issue on appeal, we would conclude that no due process violation occurred given Gunn's concession in the district court that the government did

not act in bad faith in failing to download or make screen recordings of the videos of Amanda. *See Youngblood*, 488 U.S. at 57–58.

Because no *Brady* violation occurred, the district court did not abuse its discretion when it denied Gunn's motion to continue the trial.

**AFFIRMED.**